## COURT OF APPEALS,

### Jan. 21, 1908.

## THE PEOPLE v. ANTONIO STROLLO.

### (191 N. Y. 42.)

(1). MURDER—SUFFICIENCY OF EVIDENCE.

The evidence upon the trial of a defendant indicted for murder examined and held sufficient to sustain a verdict convicting him of murder in the first degree.

(2.) ERRORS NOT AFFECTING SUBSTANTIAL RIGHTS NO GROUND FOR REVERSAL.

Contentions that the district attorney in his opening made unwarranted statements that were unfair to the defendant, and in his summary improperly alluded to defendant's failure to produce evidence; that various comments of the trial judge were prejudicial to the defendant, and that he did not receive a fair and impartial trial, examined and held not to affect the substantial rights of the defendant so as to present sufficient grounds for reversal.

(3). EVIDENCE—TESTIMONY OF CONVERSATION OVER TELEPHONE.

Testimony of a witness as to his conversation over a telephone with a man whose voice he subsequently recognized as that of the defendant, while weak as to weight, cannot be said to be incompetent.

(4). WHEN PHYSICAL SEARCH AND EXAMINATION NOT VIOLATIVE OF CONSTITUTIONAL GUARANTY.

A contention that the defendant, by being subjected to physical search and examination at the hands of the authorities, was compelled to furnish testimony against himself in contravention of section 6 of article 1 of the Constitution calls for a narrow and strained construction of the provision in question and will not be sustained, especially where the acts complained of took place before the defendant was formally accused of the crime of murder and where there is no evidence to indicate that the search was without defendant's consent or acquiescence.

(5). EVIDENCE—WHEN ORAL TESTIMONY OF CORONER COMPETENT.

Oral testimony of a coroner as to facts discovered by him at an

investigation preliminary to the formal inquest, which tended to connect the defendant with the murder, is competent.

(6). INFORMATION AS TO LEGAL RIGHTS.

The requirement of section 188 of the Code of Criminal Procedure, that a defendant charged with crime shall be informed of his legal rights when brought before a magistrate, does not apply to a preliminary investigation before a coroner where a person thereafter indicted for murder was not at the time an accused party nor even called as a witness.

(7). EVIDENCE—TESTIMONY AS TO IDENTITY.

Testimony of a witness as to the identity of the defendant, which is not unequivocal in its character, is not for that reason incompetent, but, when fortified and corroborated by other oral and circumstantial evidence, is properly received and submitted to the jury for what it is worth.

(8). EVIDENCE—WHEN TRANSCRIPT OF STATEMENT MADE BY DEFENDANT TO POLICE OFFICERS BEFORE HIS ARREST, ADMISSIBLE.

An exhibit purporting to be a stenographer's typewritten transcript of the defendant's statement made before certain police officers, and objected to on the grounds that the stenographer's original notes are lost, that there is grave doubt that the defendant understood all that was said to him when he made the statement, and that he was compelled to give testimony against himself, is properly received in evidence, where, presumably, the original notes were in shorthand which no one could read but the stenographer and he testifies to the correctness of his transcript, and where it appears that the defendant understood English fairly well, that his answers were all apparently voluntary, after being informed that anything he might say could be used against him, that the questions and answers set forth in the exhibit are framed in extremely simple English, there being nothing in it to indicate a lack of understanding on the part of the witness, and that the defendant was not, at the time of making the statement, under accusation or arrest, which would have been necessary in order to sustain the assertion that he had been compelled to testify against himself.

(9). APPEAL—LOSS OF EXHIBITS—WHEN NEW TRIAL WILL NOT BE GRANTED BECAUSE OF ABSENCE OF ORIGINAL EXHIBITS FROM RECORD.

Where during the preparation of the record on appeal from a conviction for murder in the first degree it is discovered that the

original handwriting exhibits are lost and a search for the missing papers is without result, the Court of Appeals, in the exercise of the discretionary power to disregard errors or defects which do not affect the substantial rights of the defendant, conferred upon it by sections 528 and 542 of the Code of Criminal Procedure, will uphold the judgment and deny a motion for a new trial where the evidence without the writings in question is sufficient to support the verdict, and translations of such writings, none of which are attacked for incorrectness, are printed in the record and are either established by defendant's admissions, duly proven, or are corroborated by circumstances of irresistible cogency.

APPEAL from a judgment of the Supreme Court, rendered April 30, 1906, at a Criminal Trial Term for the county of New York, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*William D. Reed* and *James E. Brande* for appellant. The record on appeal is defective because of the loss of the original handwriting exhibits. (*State* v. *Reed,* 67 Mo. 36; *State* v. *Armstrong,* 46 Mo. 588; *State* v. *Daily,* 45 Mo. 153; *Sweeden* v. *State,* 19 Ark. 205; *Bivens* v. *State,* 6 Eng. [Ark.] 451; *State* v. *Hathaway,* 115 Mo. 36; *State* v. *Dawson,* 124 Mo. 418; *R. B. Co.* v. *Stewart,* 45 N. Y. Supp. 69; *Ransom* v. *Wheelwright,* 19 Misc. Rep. 106.) Letters found in the defendant's possession on his person were improperly received in evidence against him. (*Willett* v. *People,* 27 Hun, 469; *People* v. *Altman,* 147 N. Y. 473.) The admission in evidence of facts gleaned by three physical examinations of the person of the prisoner; *first,* by police detectives; *second,* by the coroner at a preliminary examination, and, *third,* by the coroner's physician, was in violation of section 6, article 1 of the Constitution, which provides that no person shall be compelled in any criminal case to be a witness against himself. (*People* v. *Mondon* 103 N. Y. 211; 2 Story on Const. 1788; *People* v. *McCoy,* 45 How. Pr. 216; *Roberts* v. *O. R. Co.,* 29 Hun, 154; *Parker* v. *Enslow,* 102

Ill. 272; *State* v. *Jacob*, 5 Jones, 259; *People* v. *Tyler*, 36 Cal. 522; *Blackwell* v. *State*, 67 Ga. 76; *Stokes* v. *State*, 5 Baxt. [Tenn.] 619; *People* v. *Mead*, 50 Mich. 228; *State* v. *Ah Chuey*, 14 Nev. 79.) Where an inquest or hearing has been committed to writing, the writing must be produced as the best evidence, unless its absence is accounted for. The oral testimony of Coroner O'Gorman to an inquest, fully reported by an official stenographer, was incompetent. (*State* v. *Eaton*, 3 Harr. [Del.] 554; *Peter* v. *State*, 4 S. & M. [Miss.] 31; *Williams* v. *State*, 38 Tex. Cr. 128; 41 S. W. Rep. 645; *Bailey* v. *State*, 26 Tex. App. 706; 9 S. W. Rep. 270; *People* v. *Willet*, 92 N. Y. 29, 32; *People* v. *Kennedy*, 164 N. Y. 449; *People* v. *Mondon*, 103 N. Y. 211; *People* v. *Molineux*, 168 N. Y. 264; Code Crim. Pro. §§ 188, 195–200; *Teachout* v. *People*, 41 N. Y. 7.) People's Exhibit 30 was improperly admitted in evidence: *First*, through a failure in the proof of its correctness, the original stenographic notes having been lost by the witness; *second*, because there is a grave doubt whether defendant in making the replies understood all that was said, and, *third*, defendant was compelled to give evidence against himself. (*People* v. *Cascone*, 185 N. Y. 317.)

*William Travers Jerome, District Attorney* (*Robert C. Taylor* of counsel), for respondent. The appellant has suffered no prejudice by the loss of the exhibits, and is entitled to no relief: The judgment below was regular; reposes upon the verdict of a competent jury, was rendered by a competent court, and relief was denied by the trial judge, who knew all about the case and was the only man in the world who could determine whether defendant was prejudiced or not. (*Lidgerwood* v. *Rogers*, 24 J. & S. 350; 130 N. Y. 660; *People* v. *Buchanan*, 145 N. Y. 1; *People* v. *Constantino*, 153 N. Y. 24; *People* v. *Priori*, 164 N. Y. 459; *People* v. *Truck*, 170 N. Y. 203; *People* v. *Koepping*, 178 N. Y. 247; *People* v. *Patrick*, 182 N. Y.

131.) Testimony as to a conversation over the telephone with defendant was properly received. (*Murphy* v. *Jack,* 142 N. Y. 215; *People* v. *McKane,* 143 N. Y. 455; Wigmore on Ev. § 2155.) The claim that certain exhibits were improperly admitted because taken from Strollo's person is untenable. (*People* v. *Altman,* 147 N. Y. 473; *People* v. *Jefferson,* 96 N. Y. 631; *People* v. *Mullen,* 163 N. Y. 312; *People* v. *Leach,* 146 N. Y. 392; *People* v. *Cassidy,* 133 N. Y. 612; *People* v. *Parker,* 137 N. Y. 535; *People* v. *Truck,* 170 N. Y. 203.) The claim that defendant was compelled to give evidence against himself does not present reversible error. (*People* v. *Gardner,* 144 N. Y. 119; *People* v. *Truck,* 170 N. Y. 203; *People* v. *Van Wormer,* 175 N. Y. 188; *People* v. *Furlong,* 187 N. Y. 198; *State* v. *Fuller,* 34 Mont. 12; *People* v. *Kennedy,* 159 N. Y. 360.) The claim that the coroner gave secondary evidence of what occurred at a formal inquest presents no error. (3 Wigmore on Ev. § 1669; *Crouch* v. *Parker,* 56 N. Y. 597; *People* v. *Conroy,* 153 N. Y. 174; *Lyon* v. *Brown,* 31 App. Div. 67; *Weinhandler* v. *E. B. Co.,* 46 Misc. Rep. 584; *Jaffe* v. *P. R. R. Co.,* 49 Misc. Rep. 520; *Dickman* v. *MacDonald,* 50 Misc. Rep. 531; *People* v. *Kennedy,* 159 N. Y. 358.)

WERNER, J. The indictment under which the defendant was convicted of the crime of murder in the first degree charges him with the felonious, deliberate and premeditated killing of Antonio Torsielli, in the borough of the Bronx in the city and county of New York on the 17th day of August, 1905. The evidence upon which the conviction is based is wholly circumstantial. A number of questions are raised which have been very ably and forcibly presented on defendant's behalf by faithful and zealous counsel. Since these questions depend in varying degree upon our conclusions respecting the case in its entirety, we shall first determine whether the verdict of the jury is supported by the weight of evidence, and then address our-

selves to the specific attacks made upon the validity of the judg-
ment. In the necessary recital of the circumstances which tell
the story of this alleged crime, it will conduce to clearness of
understanding and brevity of statement if we follow, as nearly
as possible, the chronology of events rather than the order of
proof.

Antonio Torsielli, the deceased, was a native of Italy, coming
from the province or district of Valva, and at the time of his
death he was about twenty-six years of age. He had been in
this country for a number of years, and for some time before
his death he had lived in Lambertville, N. J., where he had been
employed by a railroad company. He had been sober, indus-
trious and thrifty. He had been preceded to this country by his
brother Vito, whom he had not seen or heard of in fourteen
years, although he had made various efforts to find him. An-
tonio Strollo, the defendant, also a native of Italy, came from
Culano which is very near Valva, and for a year or more prior
to the homicide had lived in Lambertville where he had been
employed on a canal owned by the Pennsylvania Railroad Com-
pany. These two men had known each other for several years,
and during their joint residence in Lambertville had become
somewhat intimate as appears from the fact that the defendant,
who reads and writes Italian, had on various occasions served
as the amanuensis and confidant of the deceased, who was il-
literate. The defendant had written for him letters to his rel-
atives and friends and had read to him such letters as he re-
ceived. The inference is permissible that in these circum-
stances the defendant acquired some knowledge of the pecuniary
affairs of the deceased, and of his efforts to find or locate his
brother Vito. These were the conditions on the 27th day of
July, 1905, when the deceased is said to have received a letter
dated at Yonkers, N. Y., purporting to have been written to
him by his long-lost brother Vito. This letter referred to
Vito's long absence; to his recent removal to Yonkers where

the company by which he was employed had established a factory in which he occupied the position of a boss; to his having learned that his brother, the deceased, had been looking for him; to the great pleasure which it would give Vito to see his brother once more; to Vito's ability to give Antonio remunerative employment should he choose to go to Yonkers, and closed with affectionate greetings from his wife and children. It was signed " Vito Torsielli " and under this signature was the following postscript: " Come quick because I have great pleasure to see you. My address No. 1570 Yonkers, N. Y."

As bearing upon the relation of this letter to subsequent events, it is significant that at or about the same time the defendant is said to have mailed in the local post office a letter addressed to Antonio Torsielli, Lambertville, New Jersey. It is significant because this letter was mailed at a time when the defendant and the deceased lived in the same village and saw each other daily. Affixed to this letter was a two-cent postage stamp, although a one-cent stamp would have sufficed for a local letter, and it was this fact that first attracted the attention of the postal clerk who testified to the occurrence. This letter was deposited in the post office early in the morning, was placed in the " call box " of Antonio Torsielli, the deceased, and was taken from the box later on the same day. Following the posting of this letter, and under date of July 30th, 1905, the defendant is said to have written for Antonio, the deceased, a letter to Vito, the long-lost brother, the substance of which is that Antonio had been made most happy to hear from his brother Vito, for whom he had been searching for more than two years; that he would go to Vito if desired, but would prefer to have Vito come after him; that Antonio was not sure of understanding about the work offered him by Vito, and was a little concerned about leaving the place he then had. The letter closed with expressions of regard for Vito's wife and family, and was signed " Antonio Torsielli."

Appended to it was this postscript: "When you answer, send the answer to the address below Antonio Strollo."

Scarcely more than a fortnight after the last-mentioned letter was supposed to have been mailed, Antonio Torsielli, the deceased, left Lambertville under circumstances indicating that he did not intend to return. On the 16th day of August, 1905, he went to the Lambertville National Bank and drew out the whole of his deposit amounting to $156.80. He also had his time made up for his work on the railroad, and drew all his pay, amounting to at least $39.00. In addition to this he is said to have obtained from one Espossito the sum of $100.00, which he previously loaned to that person. He had packed all his belongings in a bag described as a "grip," and on the evening of August 16th he called at the house of one Sabbato Gizzi, from whom he obtained a slip of paper containing his name and address, and to whom he stated that he was going to his brother in Yonkers. The next morning, August 17th, Antonio Torsielli, the deceased, appeared at the railroad station in Lambertville, but he was not alone. With him was the defendant. Subsequent developments disclosed that he, too, had drawn from the bank at Lambertville the last of a deposit originally amounting to $25.00, which on August 17th had been reduced by $15.00, and on August 16th was exhausted by the withdrawal of the balance of $10.06. Nor was this all that the defendant had done in making preparations for the departure of the deceased from Lambertville. He had taken to the office of the Adams Express Company in that village a valise weighing forty-two pounds and a small package which were addressed to Antonio Strollo, 21 Mulberry street, New York. This valise and its contents were subsequently identified as having belonged to the deceased. It was in these circumstances that Antonio Torsielli, the deceased, and Antonio Strollo, the defendant, met at the railroad station in Lambertville on the morning of August 17th, 1905. The deceased went to the ticket office to purchase a ticket

for New York, but was pushed aside by the defendant, who insisted upon paying for the ticket. A single return ticket was purchased, and the only explanation we have of that fact is that the defendant was in the employ of the railroad company and was permitted, in common with other employees, to ride on a pass within certain limitations. The two men left Lambertville at 8:45 A. M., arriving in New York about noon. There they first spent some time in Mott street, and witnessed a " St. Rocco " parade. Then they went to a saloon in Park street and partook of some refreshments. At half-past one in the afternoon they entered a train of the elevated railroad at Houston street and rode to the terminal in the Bronx. There they alighted and walked over to Jerome avenue and thence along the avenue until they came to a pumping station. At this point, according to the subsequent statement of the defendant, they saw a man about fifteen feet distant standing under a tree. The deceased is said to have exclaimed to the defendant, " Say, Tony, that man standing under that tree looks like my brother," to which the defendant replied, " I don't know your brother." Approaching nearer to this man, the latter, addressing Antonio Torsielli, said, " Who are you ? " and the answer was, " Who me ? My name is Antonio Torsielli." Then Antonio said to the man under the tree, " Who are you ? " to which this man replied, " Why me ? I am Vito Torsielli." At this, one or the other of them said, " Then you must be my brother." Thereupon they kissed and embraced each other, and the happily-discovered Vito said to the deceased, " I sent you four letters; why didn't you come before ? " To which the deceased replied, " Well, I had to get my time and my pay. That is the reason I couldn't come before." " Well," said this Vito, " I sent you these four letters; what did you do with them ? " Thereupon the defendant interposed and said, " I have them in my inside coat pocket." He then proceeded to produce the letters and gave them to one or the other of these reunited brothers. The

defendant then shook hands with the brothers, and without further ceremony left them.

We turn now to another chapter in the story. On the same afternoon when the search of the deceased for his long-lost brother Vito is said to have been brought to such an abrupt but happy close at the pump house, a man named Taylor, who lived in Yonkers, happened to be in Van Cortlandt Park looking for mushrooms. . He was in an open place surrounded by the wooded portions of the park, in the near vicinity of Van Cortlandt Park avenue, and about a mile and a half or two miles from Jerome avenue. There Taylor saw two men who came toward him on one of the paths through the woods. One of these men was the defendant and the other was the deceased. The latter addressed Taylor, asking him where they could get something to eat. Taylor replied that they were far from something to eat; that the nearest place was Yonkers. He directed them to retrace their steps until they came to a road, then to turn to the left and take a trolley car to Yonkers where they would find a colony of their countrymen in a place called the " Promised Land." The deceased thanked Taylor and gave him a cigar. Then the two men departed. Taylor watched them until they disappeared over the brow of a hill about two hundred and fifty feet distant. This was toward five o'clock in the afternoon, *and it was the last time that Antonio Torsielli was seen alive.*

We now resume the narrative at the point where the defendant says he parted from the alleged brothers Antonio and Vito. He left the Bronx at about half-past four and went down town reaching Mott street at about six o'clock. From there he went to Mulberry street where he purchased two books. Returning to Mott street he says he witnessed another " St. Rocco " parade and became engaged in an altercation with a drunken man who stabbed him in the left hand. Then he went to a jeweler and bought a watch and two rings. Later he went to the Mills Hotel in Bleecker street, where he remained until the next morning

occupying a room which has been referred to as " 679 East." Early the next morning he purchased a pair of new shoes and two suits of clothes. After getting something to eat he started for Lambertville, reaching there about four o'clock in the afternoon of August 18th. There he saw Lizzie Johnson, a woman to whom he gave a watch and a ring; and he also saw a Dr. Williams who treated the wound on his hand.

Here the thread of the story again takes us back to Van Cortlandt Park where Antonio Torsielli was last seen alive in the company of the defendant. On the morning after Taylor had met these two men as described, he was again in Van Cortlandt Park to gather mushrooms. He arrived there at about ten o'clock in the morning, reaching a place called the " Buffalo Field " by one of several paths leading through the woods in which he had seen the two men on the previous afternoon. Leaving this field at about one o'clock he started homeward. Somewhat to the south of the place where he last saw these men— about three or four minutes' walk distant—he came upon the body of a man lying prone in a pool of blood, face downward, with hands outstretched. Taylor at first thought the man was drunk, but when he touched one of the hands he discovered that the man was dead. A closer inspection revealed the fact that it was the body of one of the two men whom he had directed to Yonkers on the day before. Taylor at once notified the police, who immediately repaired to the scene and took charge of the body. That a brutal murder had been committed by some one was plainly evident. The autopsy performed by the coroner's physician disclosed thirty-six stab wounds, varying from $\frac{3}{8}$ to $\frac{1}{2}$ an inch in width and from four to six inches in depth, except in those portions of the anatomy where the depth could not be measured. That almost any one of these might have proven fatal is evidenced by their location. Sixteen entered the pleural cavity and penetrated the lungs. There were four punctures of the right lung and twelve of the left; one puncture of the small

bowel and one of the liver. There was evidence of great hemor-
rhage, the abdominal cavity being full of blood, and the coroner's
conclusion was that death was due to hemorrhage from mortal
stab wounds. The place where the body was found indicated
that there had been a struggle. There were many footmarks,
the earth was torn up and the weeds were trampled down. Near
the body was found a bloody handkerchief; also a parcel con-
taining clothing, a knife and several other small articles. Upon
the body was found a paper containing the name and address,
" Sabbato Gizzi, Lambertville," and three dollars and thirty-
eight cents in money. None of these articles gave any clue to
the identity of the dead man. Search and inquiry in the neigh-
borhood of the homicide, in Yonkers and Williamsbridge, re-
vealed nothing, and the body was taken to the morgue at Ford-
ham Hospital. Thus matters stood when Detective Petrosini
went to Lambertville on the following morning, which was Aug-
ust 19th. There Petrosini found Gizzi, the man whose name
and address were written on the paper which had been taken
from the person of the murdered man. Gizzi identified the
paper as one he had given Antonio Torsielli before he left Lam-
bertville, and Gizzi was thereupon taken to New York. He ac-
companied the detectives to the morgue and identified the body
which had been found in Van Cortlandt Park as that of An-
tonio Torsielli, who had lived in Lambertville. Although Gizzi
was rigorously questioned he was unable to throw further light
on the case and was allowed to go, but kept under surveillance.
Sunday, the 20th of August, had almost passed without further
disclosures concerning the murder when Detective Petrosini, be-
tween six-thirty or seven in the evening, saw Moraska, an Italian
banker in New York, and went with him to his bank. Moraska,
it is reasonable to infer, was a man who dealt largely if not
exclusively with his countrymen and had an extensive acquaint-
ance among them. He seemed to know the defendant and to
have known the deceased, for he told Petrosini that together

these two had been over to New York from Lambertville on August 17th. While Petrosini was in the bank and about eight o'clock the telephone rang. Moraska answered the call and when he learned where it was from he turned the telephone over to Petrosini, and the following conversation ensued between him and the man at the other end of the line. Petrosini asked "Who is this?" The man at the other end replied, "Why, my name is Antonio Strollo." Petrosini then asked, "What do you want?" and the other man answered, "I want to know what became of Sabbato Gizzi." Petrosini said, "I don't know about Sabbato Gizzi," and the other man asked, "Has Angelo Gizzi come over?" to which Petrosini answered, "I don't know." This closed the conversation. Petrosini did not then know the defendant or his voice, but he met him later and at the trial testified that the voice which came over the telephone in conversation was the voice of the defendant. The attention of the police officers was now turned toward the defendant, and on the following morning, which was August 21st, Detectives Petrosini and Bonoil went to Lambertville. There they located the defendant and had him brought to the office of the supervisor of the Pennsylvania Railroad Company, where they had a conversation with him in which he told, in substance, the story above narrated of his trip to New York and Yonkers with Antonio Torsielli; of the accidental and fortunate meeting of the brothers; of their departure together and his own return to New York and Lambertville. He agreed to accompany the detectives to New York as a witness to identify the body. The three took a train from Lambertville at 4:30, which brought them to New York between seven and eight o'clock in the evening. After getting supper they went to the detective bureau and from there to the morgue, where the body was exhibited to the defendant. He identified it as the body of Antonio Torsielli, the man whom he had accompanied to New York on the 17th day of August,

and whom he had left so unceremoniously at the pump house after the alleged chance meeting of the brothers.

At this juncture the defendant was informed that he was to be detained as a witness. He was escorted back to the detective bureau, where his pedigree was taken and his person was searched. In his hip pocket was found an envelope and a letter, which have already been referred to as having been written under date of July 30th, by the defendant, for Antonio Torsielli, to his supposed brother in Yonkers. When Petrosini showed this letter to the defendant, the latter at first denied having had it, but in the next breath asserted that he must have been drunk when he wrote it. The defendant's possession of this letter, three weeks after the date when it was supposed to have been mailed to Vito, the supposed brother of the deceased, might well have raised in the mind of any man except a detective the suspicion that the defendant had somewhat skillfully conceived but crudely executed a plot to lure the deceased from Lambertville to Yonkers under the false belief that the long-lost brother had at last been found. That this was not an unreasonable or improbable hypothesis is shown by the sequel, for there never had been any brother Vito in Yonkers, and there never had been any such post office address as No. 1570 Yonkers, N. Y. However that may be, we have the word of the detectives that they did not yet definitely suspect the defendant of complicity in the crime, and these were the circumstances in which a further search of the defendant's person was deemed advisable. A further search was made. It disclosed that the defendant had $33.50, although he expended during his trip to New York about $42.00, and had drawn from the bank in Lambertville only $10.06. It also disclosed the wound upon his left hand, which, as previously stated, the defendant explained by saying that he had been stabbed by a drunken man in Mott street. It further disclosed a stab wound on the defendant's right knee, to which he had not referred, and when he was inter-

rogated concerning it he gave contradictory explanations, first saying that he got it by falling down in Lambertville, and then, after his attention had been called to the fact that it was a sharp clean-cut wound, by saying that it was a cut from a scissors which had fallen on him in the house of Lizzie Johnson at Lambertville. Then the defendant was sent to the house of detention. This was on August 22nd.

At this point we pass to still another chapter in this story of gruesome interest. Police Officer Repetto, a native Italian, was detailed to the house of detention to serve in the capacity of an ostensibly detained witness. He remained there several days, and during that period made it his business to be intimate with the defendant. He conversed with him, played games with him, and saw him write. After Repetto left the house of detention the defendant wrote him several letters in Italian, which were received in evidence at the trial and translations of which were submitted for the consideration of the jury. Upon receiving the first of these letters Repetto went to the house of detenion, but meanwhile the defendant had been removed to the Tombs, after the preliminary hearing and the subsequent inquest before the coroner. So Repetto went to the Tombs and there had several interviews with the defendant. During one of these visits, which seems to have occurred after Repetto's receipt of the fourth letter, the defendant asked Repetto to do something for him. Repetto asked, "What do you want me to do?" and the defendant replied, "I would like you to ride from Houston street up to the end of the Third Avenue Road and see how long it takes you to do that and let me know." Repetto says that he did not make the trip, but wrote to the defendant that it took him sixty-four minutes. Following this the defendant wrote to Repetto saying, in substance, that Repetto could do him a great service; that he would be called as a witness upon defendant's trial; that he wished Repetto to testify to a meeting with the defendant in front of the place where Repetto was sup-

posed to work and to a conversation there between them; that the time was to be fixed as between 5:20 and 5:30 P. M.; that if Repetto was asked how the defendant was dressed on that occasion, he was to say that he had on a black coat, russet shoes, with white striped trousers, and brown hat but no recollection as to the tie; that if asked whether the defendant had a mark on his hand, to say no; that he had on a ring set with a black stone; that Repetto, after leaving his place of work, had gone over on Mott street where he again met the defendant at eight or half-past eight o'clock, and he then had a handkerchief around his hand; that when Repetto asked him about that the defendant told him that some one had struck him. The letter closes with the admonition to Repetto " don't mention this to any one." The description in this letter of the defendant's dress and appearance on the afternoon of August 17th is distinctly at variance with the description of the defendant given by the witness Taylor, the mushroom digger, who says that the defendant had on a blue suit, a light soft Fedora hat, a red necktie, low cut tan shoes and red socks or stockings; and it may also be added, in passing, that the description of the defendant's dress given by Taylor is corroborated by several witnesses.

There is yet another phase of the case that is of importance in view of the questions raised upon this appeal. On the 22nd day of August the defendant was orally examined in the office of Acting Police Inspector O'Brien at police headquarters. There were present Captain McCauley, Sergeant Petrosini, Detective Bonoil, Inspector Price and Stenographer Haskins. In response to questions put to him by one or the other of these officers, he told a story which, in its main features, is a repetition of the stories which he had related to the various officers at different times, and the outline of which we have attempted to give in this narrative. Further mention of this statement and the circumstances under which it was adduced will be reserved until we consider the specific

questions raised by defendant's counsel. In this connection it should also be stated that on the same day, August 22nd, Coroner O'Gorman held what he termed a preliminary examination, at which the defendant was present. At this examination the defendant made the same statement as to the wounds upon his person that he had previously made to Officers Petrosini and Bonoil during their examination of him. This preliminary examination was followed by the regular inquest conducted by Coroner Berry.

Having thus given, as briefly as possible, a *resume* of the salient facts which the jury had the right to regard as established by the evidence, it remains to be ascertained whether, assuming the competency and relevancy of the evidence by which the facts were established, the proof as a whole warranted the verdict upon which the judgment of conviction was entered. This can best be done by making a brief synopsis of the leading features of the case, with the addition of a few facts not yet adverted to.

That the defendant and the deceased left Lambertville together on the 17th day of August 1905, is so incontrovertibly established as to be beyond the possibility of denial or the necessity for discussion. That the defendant and the deceased were together in Van Cortlandt Park on the afternoon of that day is clearly proven. The defendant admits having been in that neighborhood, and Taylor's identification of him as one of the men whom he saw in the woods is positive and uncontradicted. The defendant was the last person seen with the deceased before the latter's death. On the next day the body of the deceased was found within a few hundred feet of the spot where he and the defendant had been seen on the previous afternoon. The body gave unmistakable evidence of a most brutal murder. Who did it? Let us now retrace our steps to make a summary survey of the occurrences which led to this trip of these two men and its tragic ending. In that behalf it is

11

proper to consider their previous acquaintance and the circumstances under which the trip was made. The deceased had been looking for his brother. The defendant knew that. The deceased had money. The defendant knew that. His own statement to the detective as to the amount of money which the deceased had with him when he left Lambertville is corroborated by other conclusive evidence. The deceased had sent all his personal belongings to New York. The defendant knew that. He attended to having them shipped to the Italian Central Express Company at 21 Mulberry street, in care of himself; and on the next day the defendant had them re-shipped to himself at Lambertville, where he subsequently took possession of them. The defendant had two wounds upon his person in appearance not unlike the many which caused the death of the deceased. The defendant had in his possession a letter purporting to have been written by the deceased to his brother. The defendant admits that he wrote that letter. His possession of it was an irrefutable admission that it had never been mailed. Why had it never been mailed? Was it because there was no Vito Torsielli in Yonkers, and no such address as No. 1570 Yonkers, N. Y.? Why was the letter written at all? was it because the deceased had been told by some one that the brother for whom he had long been searching was in Yonkers? Are not these questions answered by the statements of the deceased just before leaving Lambertville, by the trip to the Bronx, and by the defendant's own admissions? How had the deceased become aware that his brother was in Yonkers? The defendant says it was by means of a letter which the deceased received in July. This statement is supported by the letter of the deceased in reply, and the admission of the defendant, for he reproduces from memory a copy of that first letter. How did the deceased get that letter? Did not the jury have the right to find the answer in the testimony of the witness Philips, the postal clerk, who saw the defendant mail a letter

in Lambertville to the deceased, stamped with a two-cent stamp? The inference that this was .*the* letter is permissible, because these two men, residing in this small village, saw each other practically every day; because the deceased could not read and could, therefore, be easily imposed upon by the color of the two-cent postage stamp, and thus led to believe that it was a letter from outside the village; and because the arrangements for the departure of the deceased from Lambertville followed so soon upon the supposed exchange of the two letters referred to. If the letter posted by the defendant in July was the letter supposed by the deceased to have been written to him by his brother Vito, why was it written? Did the defendant then look forward with prophetic vision to that happy chance meeting of the brothers at the pumping station in Jerome avenue? If not, is it a violent conclusion that the letter and the answer thereto were fabricated for a purpose? What was that purpose? Unfortunately for the administration of justice, the limitations of human intelligence are such that many things must rest upon reasonable inference rather than upon absolute knowledge. No one can know the workings of the defendant's mind except as his words and acts have disclosed them. The deceased had saved considerable money and the defendant very little. All that the deceased had, amounting to nearly $300, he took with him on the fatal journey and only $3.38 was found upon his body.. All that the defendant is known to have had at that time was considerably less than he is known to have expended after leaving the deceased and before returning to Lambertvile, and yet, when he was searched by the detectives, he still had more than twice as much as he withdrew from the bank in closing his account. These facts are not conclusive. But are they not sufficient, in connection with the other circumstances, to warrant a jury in finding that this whole dreadful affair was the result of a plot·which originated in the brain of the defendant, and that its underlying motive was robbery?

Some of our associates doubt the justice of this judgment because, perchance, there is a possibility of the truth of the defendant's story as to the alleged meeting of the alleged brothers. We answer that courts are not permitted to base their judgments upon bare possibilities where they are opposed to the laws of human experience and reasonable probability. The fabled creations of romantic fiction contain nothing more improbable than the story of the defendant as to the meeting of the deceased and his supposed brother at the pumping station, and the defendant's manner of leaving them. When this story is set over against the inexorable facts above set forth we feel constrained to say that the jury were justified in their conclusion that the deceased had been murdered with deliberate and premeditated purpose and intent and that the defendant was the perpetrator of the heinous crime.

We now turn to the brief of defendant's counsel to consider the contentions which we regard as of sufficient importance to require discussion.

1. The contentions that the district attorney in his opening made unwarranted statements that were unfair to the defendant; that the district attorney in his summary improperly alluded to defendant's failure to produce evidence; that various comments of the trial court were prejudicial to the defendant, and that the defendant did not receive such a fair and impartial trial as he was entitled to under the law, may be disposed of in group, with the single suggestion that a careful reading of the record reveals nothing in that behalf which we feel authorized to lay hold of for the purpose of reversing the judgment. Under the statute our powers and duties in capital cases are strictly correlative. While we have power to reverse in the interest of justice, even where no exceptions are taken, it is also our duty to disregard errors which, although excepted to, do not affect the substantial rights of a defendant. Guided by this rule, we feel constrained to hold that none of the gen-

eral criticisms referred to under this head present sufficient grounds for reversal.

2. It is urged that it was error to admit the testimony of Petrosini as to his conversation over the telephone with a man whose voice he subsequently recognized as the voice of the defendant. We regard the argument of defendant's counsel against this evidence as more cogent upon its weight than its competency. The jury might well have thought that this evidence was weak, but we cannot say it was incompetent.

3. The argument that the defendant, by being subjected to physical search and examination at the hands of the police officers, was compelled to testify against himself, seems to us to be devoid of merit. It is a sufficient answer to this suggestion that the acts complained of took place before the defendant was formally accused as the slayer of Torsielli, and that there is nothing to indicate that the search was without defendant's consent or acquiescence; but even if that were not so, we should be indisposed to give our Constitution the narrow and strained construction that is here contended for. There may be cases where physical coercion may be employed to such a degree as to come within the prohibition of the constitutional provision referred to, but we do not think this is one of them.

4. It is claimed that Coroner O'Gorman was improperly permitted to give oral testimony of evidentiary matters of record, and that the defendant was not informed of his legal rights at the Coroner's inquest as required by section 188 of the Code of Criminal Procedure. The record upon this point is not as clear as we wish it were, but we are inclined to the view that what occurred in Coroner O'Gorman's office was not the formal inquest, but merely a preliminary investigation. The testimony of O'Gorman as to the wounds upon the defendant's person, and Taylor's apparently voluntary identification of the defendant, were, under the circumstances, entirely competent; but even if that were in doubt, both of these

matters were so completely and properly established in other ways that no possible harm could have come to the defendant as the result of these alleged irregularities. Upon the contention that the defendant was entitled to be informed of his legal rights at this hearing, it is enough to say that he was not then an accused party and was not even called as a witness. (*People* v. *Molineux*, 168 N. Y. 331, 16 N. Y. Crim Rep 120.)

5. The exceptions taken to the trial court's rulings upon the testimony of the witness, Olive Phillips, seem to be based wholly upon the failure of that witness to positively identify the defendant as the man who had given her the letter in the Lambertville post office. It may be conceded that the testimony of this witness as to the identity of the defendant was not as unequivocal as that of other witnesses, but it cannot be said that it failed altogether. Her testimony in that respect was amply fortified and corroborated by other oral and circumstantial evidence. We think, therefore, that the trial court was fully justified in receiving the testimony of this witness and submitting it to the jury for what it was worth.

6. It is said that Exhibit 30, which purports to be a stenographer's typewritten transcript of the defendant's statement made before Captain McCauley and other officers, was improperly received in evidence to the prejudice of the defendant. The assignments of error in this regard are that the stenographer's original notes are lost; that there is a grave doubt whether the defendant understood all that was said to him when he made the statement, and that the defendant was compelled to give evidence against himself. Here again we are presented with questions which, upon the record before us, are not difficult of solution. The original notes of the stenographer were presumably shorthand notes. Just how their production at the trial would have helped matters is not apparent, since it is more than probable that no one could have read them except the stenographer who testified to the correct-

ness of his transcript. That the defendant understood English fairly well is shown in a variety of ways by the record of the trial. That Petrosini and the other officers who understood Italian assisted the defendant with explanation and interpretation during the course of his statement in no wise serves to impeach the testimony of the stenographer, who says that the defendant made all the answers which appear in the transcript used upon the trial and that they were accurately taken down. The answers of the defendant were all apparently voluntary, after he had been distinctly informed that anything he might say could be used against him. A reading of Exhibit 30 discloses the fact that the questions and answers which it sets forth are framed in extremely simple English, and there is nothing in it to indicate a lack of understanding on the part of the witness. He was not then under accusation or arrest, so that there seems to be nothing in the assertion that he was compelled to testify against himself. A reference to other parts of the record reveals the fact, moreover, that Exhibit 30 contains nothing that was not fully established by competent evidence in other ways. In view of these facts we think there was no error in receiving this evidence.

7. In the course of the trial the prosecution called as a witness a handwriting expert named Carvalho, whose evidence is attacked because it is said to be inadequate and insufficient. Consideration of this point necessitates some further references to the record. Various writings, said to have been written by the defendant, were offered and received in evidence at different stages of the trial. Exhibit 2, known as the "hip pocket" letter, is the letter written by the defendant for the deceased to the fictitious Vito of Yonkers, which the defendant pretended to mail, but kept in his possession until found by the detectives when they searched him. The defendant's handwriting in that letter is established by his own repeated admissions. Exhibit 23 is a reproduction of the letter which

was supposed to have been written by the mythical Vito to the deceased and which is translated in Exhibit 24. The Officer Illich testified that the defendant wrote that reproduction. Exhibit 29 contains the signature of the defendant and his Lambertville address upon the tag attached to the valise of the deceased at the express office in Mulberry street. Its authenticity was established by the testimony of Dimetto, the employee of the express company, who saw the defendant write it. Exhibits 33 to 37, inclusive, are the letters written in Italian in the tombs by the defendant to Repetto, and Exhibits 38 to 42, inclusive, are the translations. These are translations established by the evidence of Repetto. It was while this witness was being cross-examined as to these last-mentioned exhibits, that his attention was called by defendant's counsel to a letter which the defendant had shown him in the tombs. This had been colloquially referred to as the " Black Hand " letter. It was offered in evidence by defendant's counsel, received without objection, marked defendant's Exhibit A, and appears in its translated form as Exhibit B. This " Black Hand " letter purports to have been written by a member of the Black Hand Society and stated in substance that the writer was then leaving New York harbor; that he swears upon the cross and the blood of his veins that the defendant is innocent; that the murderer of Torsielli had been captured; that the defendant had been lured to New York by Guiseppa Rosa, who knew the defendant in Lambertville for two years; that Rosa was a Calabrese and carried a mighty grudge; that the man who had stabbed the defendant with a knife was Antonio Villa, who " had to kill " the defendant, but the latter was fortunate; that this Villa was then in jail but the writer did not know for how long. This alleged " Black Hand " letter ends by saying that the writer had given the defendant all the information he had. This letter was brought into the case by the defendant's counsel at the very close of a protracted trial.

Had it been objected to it would have been clearly inadmissible because there was no attempt at authentication. But it was not objected to and was received in evidence. Upon the spur of the moment the district attorney sent for Carvalho, the expert. After less than an hour's examination of Exhibits 2, 23, 35 and " A " he testified that they were all in the same handwriting. It may be conceded that this hurried study of these writings furnished very slender support for an expert opinion. The district attorney might well have left for the consideration of the jury the alleged " Black Hand " letter without explanation or attack, for it bore upon it face indications of spuriousness that could hardly have deceived twelve men of average intelligence. In this view of the matter it is hardly worth while to speculate as to what might have happened if the expert had made a more deliberate and careful examination of the writings before giving his opinion as to their authorship. A careful study of this record convinces us that the evidence is sufficient to support the judgment against the defendant, without considering the testimony of Carvalho at all.

We have now reached the most troublesome, if not the most serious, question in the case. When the record for this appeal was being prepared for the printer, it was discovered that it did not contain the original handwriting exhibits which were used at the trial. Counsel for the defendant at once brought this omission to the attention of the district attorney, who instituted a search for the missing papers, but without result. Thereupon the defendant's counsel made a motion for a new trial, or for a re-settlement of the case on appeal, or for such other relief in the premises as the court might deem just and proper. This motion was heard and denied by Mr. Justice O'Gorman who had presided at the trial. Then the record as it now stands was made up, and the defendant's counsel have brought the matter to the attention of this court in the form of a preliminary objection to the return on appeal, and

in that connection they also ask us to review the order denying
a motion for a new trial. That the loss of these papers presents
a most disagreeable predicament is painfully self-evident. It
raises a question which, in the abstract, can be given the appear-
ance of supreme importance. It is easily conceivable that there
may be conditions in which such a loss would imperatively re-
quire a new trial even if that result should defeat the ends
of justice. In a case, for instance, so wholly or largely de-
pendent upon documentary evidence that there would be no
proof and could be no judgment without the documents, an
appellate court might be simply powerless to do anything ex-
cept to grant a new trial, leaving it to the court of original
jurisdiction to make such disposition of the case as would be
required by the state of the evidence on the new trial. There
is, however, another side to this question. There may be cases
in which the loss of documents is of no substantial impor-
tance, as where that kind of evidence is purely incidental or
supplementary. There may be other cases in which the loss of
papers presents a perplexity more apparent than real, as where
copies are in existence, and the correctness of the copies is un-
questioned or unquestionable. There may still be other cases
in which the loss of writings may be unduly magnified by the
character and importance of the issue at stake, as where in
the course of a trial for murder writings are used, the originals
of which are subsequently lost, but copies of which are in exist-
ence. In such cases counsel for the defendant may well deem
it a part of his sworn duty to insist upon a literally perfect
return, without reference to the actual and practical conse-
quences of the loss. These various elements of the question,
considered in connection with the functions and powers of this
court, bring us face to face with the situation that is apparently
paradoxical but actually logical. That is to say, we might have
a condition in which we would be compelled, in a civil case, to
grant a new trial for a loss of original documentary evidence,

although under similar conditions, in a case involving human life and liberty, we may be bound to deny such relief. And why should this seemingly anomalous difference exist? Because this is a court of statutory origin and vested with none but statutory jurisdiction. Thus it happens that in civil cases our powers are limited to the review of errors which are raised and presented by exceptions, while in criminal cases we are not only empowered but commanded to give judgment without regard to technical errors or defeats, or to exceptions which do not affect the substantial rights of the parties. (Code Crim. Pro. sec. 542.) This power of review on criminal appeals is still further broadened in capital cases by the legislative direction that "when the judgment is of death, the Court of Appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exceptions shall have been taken or not in the court below." (Code Crim. Pro. sec. 528.)

In the light of these considerations there still remains the practical question: What shall be done about the lost writings in the case at bar? We have already expressed our assent to the verdict of the jury. The granting of a new trial because of the loss of the original writings herein would be the equivalent of a declaration by this court that the evidence, without them, is insufficient to support the verdict. We should regard that as a consummation so inimical to the interests of justice that it ought to be precluded if possible. Therefore, we refer again briefly to the writings to see whether the present state of the record will fairly justify any other course. The "Gizzi" address may be passed without discussion. The "hip pocket" letter (Exhibit 2) and the "Vito" letter (Exhibit 23), the originals of which were in Italian, were translated into English. These translations are not attacked for incorrectness and are in the record. The defendant admitted, over and over again, that he wrote the originals, and these admissions are supple-

mented by circumstances which can neither be ignored nor misinterpreted. The defendant's signature at the express office and the express tag may also be passed as inconsequential to this phase of the case. The " Repetto " letters, written in Italian, were translated into English and these translations are in the record. (Exhibits 38 to 42 inclusive.) The only suggestion that these translations are not correct is that they were made by an Italian police officer of limited education. Then comes the " Black Hand " letter (Exhibit A), which was brought into the case by the defendant, through his translation (Exhibit B). We have before us, therefore, all that would be intelligible to judges who are not Italian scholars, even if the originals were in the record. All the writings now the subject of discussion, with the possible exception of the Repetto letters, are established by the defendant's admissions, duly proven, and all without exception are corroborated by circumstances of irresistible cogency. Holding these views with respect to the state of the record and the character of the evidence by which we regard the defendant's guilt as abundantly established, we are persuaded that we can best perform the duty imposed upon us by voting to uphold the judgment. There are other circumstances in the case to which we have not referred in detail, because the discussion, even as it is, has extended beyond the limits within which we had hoped to confine it.

We close with a few observations as to the general conduct of the trial, and the attitude of the police department toward the defendant. That the trial was not faultless may be conceded; but perfection is not to be expected in a science that is but mildly characterized as inexact. Few criminal records reach this court that are not open to some criticism, and there are many that would be much improved by greater care and caution on the part of prosecuting officers in the trial of cases. We must take these records as we find them and dispose of the questions involved as best we can. Neither can we be expected

to lay down fixed rules for the guidance of police officers in the discharge of their duties. All that we can do is to see that they keep within the pale of the law. In the case at bar the methods of the detectives have been severely criticised, but we think unjustly. A careful analysis of the testimony shows that if the detectives had been more intent upon securing the conviction of the defendant than they were upon getting at the facts, they could easily have attributed to him statements and admissions much more inculpatory than any found in this record. They could easily have compressed into a single interview or examination the patient work of days in trying to unravel the mysteries of a complicated case. While we should not hesitate to interpose our corrective powers whenever it is necessary, we should also be careful not to thwart the ends of justice by hypercritical supervision. In our endeavor to shield those who have been convicted of crime from the improper or unlawful exercise of official power, we must not forget our duty to the state. Under a judicial system which has for centuries magnified the sacredness of individual rights, there is much less danger of doing injustice to the individual than there is of overlooking the obligations of those in authority to organized society.

Our review of this record, in the light of these considerations, impels us to the conclusion that the judgment of conviction herein should be affirmed.

CULLEN, Ch. J., GRAY and HAIGHT, JJ., concur; EDWARD T. BARTLETT, WILLARD BARTLETT and HISCOCK, JJ., dissent.

Judgment of conviction affirmed.